Mimi CUTLER, Pamela S. Ellsworth, and
Stephen D. Annand, Plaintiffs,

v.

Dr. Donald KENNEDY, Commissioner,
Food and Drug Administration,
Defendant,

and

The Proprietary Association, Inc.,
Defendant-Intervenor.

Civ. A. No. 77–0734.

United States District Court,
District of Columbia.

July 16, 1979.

William B. Schultz, Washington, D.C., for plaintiff.

Patricia J. Kenney, Asst. U.S. Atty., Washington, D.C., for defendant Dr. Donald Kennedy.

Robert A. Altman, Clifford, Glass, McIlwain & Finney, Washington, D.C., for defendant Proprietary Ass'n, Inc.

## OPINION

SIRICA, District Judge.

This action presents a consumer challenge to regulations adopted by the Food and Drug Administration (FDA) for policing the nation's over-the-counter (OTC) drug market. Although the original plaintiffs—Health Research Group and Public Citizen—were dismissed as parties for lack of standing, the Court allowed an amendment of the complaint which effectively substituted three individual OTC drug consumers as parties plaintiff. *Health Research Group v. Kennedy*, 82 F.R.D. 21 (D.D.C.1979).

1. The Proprietary Association, a trade association composed of manufacturers of OTC drugs, was granted leave to intervene in July 1977.

2. Defendants also claim that plaintiffs have failed to exhaust their administrative remedies. To the extent that this raises a claim different from defendants' arguments concerning a lack of ripeness, the Court finds the failure to exhaust contention to be wholly without merit.

3. The parties originally filed cross-motions for summary judgment in 1977, the action having been filed in April of that year. Oral argument on those motions was continued on several occasions at the request of the parties; it was eventually held on March 29, 1978. On December 1, 1978, the Court issued an order expressing concern about the inadequacy of the record with regard to the original plaintiffs' standing. That order also raised, sua sponte, a question concerning the ripeness of plaintiffs' claims for judicial review.

The current plaintiffs are represented by the same counsel as the original plaintiffs. The

The defendants, FDA Commissioner Donald Kennedy and the Proprietary Association, Inc.[1] now seek dismissal of the action on the grounds that the new plaintiffs lack standing and that their claims are not ripe.[2] Because the Court finds that the three consumer plaintiffs have standing to challenge the FDA's OTC regulations and that their claims are ripe for judicial review, it will reach the merits of their motion for summary judgment.[3] On the merits, the Court concludes that, whatever the wisdom of the FDA's regulatory scheme from a policy perspective, certain of its aspects are fundamentally inconsistent with the Federal Food, Drug, and Cosmetic Act and are therefore unlawful.

## I.

### A. The Statutory Scheme

With the enactment of the Federal Food, Drug, and Cosmetic Act of 1938,[4] Congress for the first time established a system of premarketing clearance for the nation's drugs. Under the Act, no new drug may be introduced into commerce unless the FDA Commissioner[5] first approves a new drug application (NDA) with respect to that drug. Federal Food, Drug, and Cosmetic Act, § 505(a), 21 U.S.C. § 355(a) (1976). As

Court perceives no difficulty whatever in simply permitting the new plaintiffs to adopt the original pleadings and briefs. As the Court observed in its March 1979 Opinion, the amended complaint merely placed several individual drug consumers, whom the original plaintiffs wished to represent in an associational capacity, in the position of their purported representatives. *See* 82 F.R.D. at 30.

Supplementary briefs and affidavits on the standing and ripeness issues filed by all parties since the Court's December 1 order have provided the Court with a current record of the challenged regulatory program.

4. Ch. 675, 52 Stat. 1052 (current version at 21 U.S.C. §§ 301–392 (1976)).

5. Functions and responsibilities which the Act gives to the Secretary of Health, Education, and Welfare have been delegated to the Commissioner of the FDA. 21 C.F.R. § 5.1 (1978).

originally enacted, the Act imposed four requirements for NDA approval which were satisfied generally by establishing that a drug was safe for use under the recommended conditions. *See id.* § 505(d), 21 U.S.C. § 355(d).

Two additional requirements for NDA approval were added to the original four in a major amendment to the Act in 1962.[6] One was that the labeling of the product not be false or misleading. *Id.* § 505(d)(6), 21 U.S.C. § 355(d)(6). The other, and crucial, addition was a requirement of efficacy. As the Act stands today, new drugs must be efficacious, as well as safe, for the indicated use and there must be "substantial evidence"[7] of such efficacy. *Id.* § 505(d)(5), 21 U.S.C. § 355(d)(5). Significantly, substantial evidence was defined to encompass only adequate and well-controlled investigations by experts.[8] In conformance with the new efficacy requirement, subsection (e) of section 505 of the Act was amended to direct the Commissioner to *withdraw* approval of a drug's application whenever new information indicates a lack of substantial evidence that the drug is effective. *Id.* § 505(e), 21 U.S.C. § 555(e). *See generally American Public Health Ass'n v. Veneman,* 349 F.Supp. 1311, 1315–16 (D.D.C.1972).

The premarketing clearance requirement does not, however, apply to a drug which is not a "new drug" as that term is defined in the Act. Pursuant to section 201(p), 21 U.S.C. § 321(p) (1976), a drug can be considered a new drug for one of two reasons. The first, and most important, is that a drug is a new drug if it "is *not generally recognized, among experts* qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, *as safe and effective* for use under the conditions. prescribed, recommended, or suggested in the labeling thereof." Federal Food, Drug, and Cosmetic Act, § 201(p)(1), 21 U.S.C. § 321(p)(1) (emphasis added). Second, a drug is considered to be "new" if, despite being so recognized, it has not "been used to a material extent or for a material time" under the recommended conditions. *Id.* § 201(p)(2), 21 U.S.C. § 321(p)(2). In short, then, any drug which is not generally recognized by experts as safe and effective[9] or which has not been in use to a

---

**6.** Drug Amendments of 1962 (Harris-Kefauver Act), Pub.L.No. 87–781, 76 Stat. 780. The premarketing clearance scheme for drugs established by the 1938 Act and the 1962 amendments were discussed at length in a series of four companion cases decided by the Supreme Court in 1973: *Weinberger v. Hynson, Westcott and Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207; *CIBA Corp. v. Weinberger,* 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230; *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235; and *USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244. For a thorough discussion of the significance of the Drug Amendments of 1962 see Note, *Drug Efficacy and the 1962 Drug Amendments,* 60 Geo.L.J. 185 (1971).

**7.** The Act defines substantial evidence as:
evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended or suggested in the labeling or proposed labeling thereof.

Federal Food, Drug, and Cosmetic Act of 1938, § 505(d), 21 U.S.C. § 355(d) (1976).

**8.** *See id.*

**9.** The Drug Amendments of 1962, in addition to adding substantial evidence of effectiveness to the requirements for approval of an NDA, also amended the new drug definition to require general recognition of effectiveness, as well as safety, in order for a drug to escape new drug status. Pub.L.No. 87–781, § 102(a), 76 Stat. 780. In fact, the Senate committee which considered S. 1552, 87 Cong., 1st Sess. (1961), U.S.Code Cong. & Admin.News, p. 2884, the bill eventually enacted as the Drug Amendments of 1962, had amended the introduced version to eliminate the change in the new drug definition. Under that amendment, reported out on July 16, 1962, only the requirements for approval of an NDA would have been amended to require evidence of efficacy. *See* S.Rep.No. 1744, 87th Cong., 2d Sess. (1962). But the committee reported out a second version of the bill on August 21, 1962, which reinstated the amendment to the new drug definition. *See id.* part 2. Both the substantially similar House version of S. 1552, H.R. 11581, 87th Cong., 2d Sess. (1962), and the originally introduced version of S. 1552 contained the effectiveness

material extent and for a material time is a new drug and must be covered by an approved NDA before it can be marketed.[10] A drug which is not a new drug, *i. e.*, which *is* generally recognized as safe and effective for the indicated uses and *has* been in use for a material time under the recommended conditions, need not be covered by an NDA. Such a drug is therefore not subject to either clearance by the FDA before it is marketed, nor active regulation by the agency subsequent to its marketing.

Although the Act makes it unlawful to market a new drug without an effective NDA, it provides no mechanism for even an administrative determination of new drug status prior to marketing. A manufacturer who believes that his drug is not new may simply market the drug without application to the FDA or official determination of its new or not new status. The Act does, however, provide potentially stiff penalties for a manufacturer who is wrong about the status of his drug. The marketing of a new drug without an approved NDA is a "prohibited act" under section 301(d) of the Act, 21 U.S.C. § 331(d) (1976), and subjects the introducer of the drug to actions by the United States for injunction, seizure and condemnation, and even criminal penalties. *See id.* §§ 301–304, 21 U.S.C. §§ 331–334.

The Act is therefore somewhat incongruous in that it provides a stringent scheme for both premarketing clearance and post-marketing regulation of new drugs, but, at least in effect, leaves it up to the introducer of the drug to decide whether his drug is subject to the scheme in the first place. The *in terrorem* effect of potential judicial enforcement actions, the possibility of penalties, and the extremely broad definition of a new drug as any one not *generally recognized* by experts as safe and effective are apparently designed to encourage voluntary compliance and to render the scheme self-policing.

The addition of the explicit effectiveness requirement in the Drug Amendments of 1962 worked a significant change in the law. Previously, the FDA refused to approve a new drug application on grounds of lack of effectiveness only in limited circumstances, *e. g.*, where the drug was offered for use in treating life-threatening disease.[11] Where a drug was safe, ineffective, but essentially innocuous, however, the FDA's only remedy was to seek judicial remedies under the Act's misbranding provision.[12] With the 1962 amendments and

amendment to the new drug definition. For a discussion of the controversy which arose over the committee amendments reported out in the July version of the bill, see 42 Cong.Rec. 10105–08, 10277–78 (1962).

Under the July version, a drug not generally recognized as safe, and thus subject to the NDA procedure, would have had to be shown both safe and effective for the indicated use before marketing. A drug generally recognized as safe, however, and therefore not a new drug, would have escaped the effectiveness requirement altogether, except to the extent that any lack of effectiveness would have constituted misbranding under other provisions of the 1938 Act. As finally enacted, the amendment to the definitional section requiring general recognition of effectiveness, as well as safety, means that lack of such recognition can, in itself, result in new drug status, thereby triggering the NDA requirement.

10. There are exceptions to this statement because of two statutory grandfather provisions and a limited exemption allowed drugs used in research. Certain drugs which were subject to the Food and Drugs Act of June 30, 1906 are excluded from the new drug definition and do not require general recognition of safety or effectiveness to avoid the NDA requirement. *See* Federal Food, Drug, and Cosmetic Act of 1938, § 201(p)(1), 21 U.S.C. § 321(p)(1) (1976). More important, certain drugs which were not new drugs on the day preceding enactment of the 1962 amendments are exempted from the effectiveness requirement in the new drug definition, so long as the conditions for use in the labeling have not changed since that time. *See* notes 14–15 and accompanying text, *infra. See generally USV Pharmaceutical Corp. v. Weinberger*, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973). The research exemption is found at 21 U.S.C. § 355(i) (1976).

11. *See* S.Rep.No. 1744, 87th Cong., 2d Sess. 15–16 (1962).

12. *Id.* The misbranding provision is found in section 301 of the 1938 Act, 21 U.S.C. §§ 331(a)–331(b) (1976). The FDA's power to challenge safe but ineffective drugs as misbranded was termed "relatively ineffective" by Senator Kefauver, the principal sponsor of the 1962 amendments. 42 Cong.Rec. 10278 (1962).

the explicit requirements of substantial evidence of efficacy for new drugs and general recognition of efficacy for drugs claimed to be not new, the "FDA was faced with the massive task of reevaluating almost all marketed drugs." *Smithkline Corp. v. FDA,* 190 U.S.App.D.C. 210, 215, 587 F.2d 1107, 1112 (1978).[13]

Congress cushioned the impact of its 1962 revision of the law with comprehensive transitional provisions. First, all new drug applications which were "effective" (the terminology under the original 1938 Act) on the day preceding enactment of the 1962 amendments were deemed "approved" under the amendments. Drug Amendments of 1962, § 107(c), 21 U.S.C. § 321 note (1976). The effectiveness requirements added to section 505 of the 1938 Act were to apply to such drugs only with regard to the FDA's power to *withdraw* approval of an NDA for lack of substantial evidence of effectiveness, so long as the recommended conditions of use covered by the NDA did not change. *Id.* But even this power was suspended for a period of two years following enactment of the amendments. In short, "manufacturers were given two years to develop substantial evidence of effectiveness, during which previously approved NDA's could not be withdrawn by FDA for a drug's lack of effectiveness." *Weinberger v. Hynson, Westcott and Dunning, Inc.,*

412 U.S. 609, 614, 93 S.Ct. 2469, 2475, 37 L.Ed.2d 207 (1973).

Second, with respect to marketed drugs which, on the day preceding enactment of the amendments, were *not* new drugs (were generally recognized as safe) and were not "covered" by an effective NDA, the effectiveness requirement added to the new drug definition in section 201(p) does not apply to such drug "when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day." Drug Amendments of 1962, § 107(c)(4), 21 U.S.C. § 321 note (1976).[14] Unlike the grace period provided for most new drugs, this transitional provision confers a permanent exemption from the otherwise comprehensive effectiveness requirements of the amended Act.[15] Such drugs are thus "grandfathered" so long as the labeling claims and recommendations do not change from those made in 1962.

## B. The Regulatory Response

Faced with the task of evaluating all marketed drugs to implement the efficacy provisions of the 1962 amendments, the FDA rejected a case-by-case review of the thousands of drugs covered by approved NDA's in favor of rulemaking and administrative summary judgment procedures. *See generally Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469,

**13.** The FDA's regulatory burden was also increased by virtue of another 1962 amendment to the Act which requires the agency to either approve or give notice of hearing on an NDA within 180 days. Federal Food, Drug, and Cosmetic Act, § 505(c), 21 U.S.C. § 355(c) (1976). Under the original version of the Act, the application simply became effective automatically if not disapproved within certain time limits. 21 U.S.C. § 355 note (1976).

**14.** Section 107(c)(4) provides:
In the case of any drug which, on the day immediately preceding the enactment date, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force [subsec. (p) of this section], and (C) was not covered by an effective application under section 505 of that Act [section 355 of this title], the amendments to section 201(p) [subsection (p) of this section] made

by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day.
The phrase in 107(c)(4)(C) "not covered by an effective application" has been construed quite narrowly. Drugs for which no NDA had been filed but which were being marketed in reliance upon the pioneer NDA's of similar drugs (so called "me-too" drugs) are considered to have been "covered" by an NDA. *See USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973).

**15.** The only other class of drugs to be similarly exempted from the effectiveness requirements would be those falling under the Act's other grandfather provision. It excludes certain drugs which were subject to the Food and Drugs Act of 1906. *See* note 10, *supra.*

37 L.Ed.2d 207 (1973). In June 1966, roughly four years after passage of the 1962 amendments and almost two years after expiration of the two-year grace period for new drugs, the FDA contracted with the National Academy of Science-National Research Council (NAS–NRC) to review the efficacy of all drugs covered by approved NDA's by class (therapeutic category) of drug. This review became known as the Drug Efficacy Study (DESI). Eventually, individual NAS–NRC panels reported their findings regarding the effectiveness of each class of drug to the FDA. The FDA then reviewed the findings and issued its own final conclusions with regard to the claims of effectiveness made for each class.

Because the Act excludes only those drugs *generally recognized* as safe and effective from new drug status, most drugs not subject to active FDA regulation because they are "not new" are over-the-counter drugs, while most new drugs are sold by prescription only. Consequently, most of the drugs covered by approved NDA's and reviewed in the DESI process were prescription drugs.[16]

Upon completion of the DESI study, the FDA turned its attention to the vast OTC market. In 1972 it adopted procedures for reviewing the safety and efficacy of all OTC drugs in the Drug Review Program. *See* 21 C.F.R. part 330 (1978) (current version). Seventeen advisory review panels of outside experts were established to review twenty-six groups of OTC drugs (*e. g.*, antacids, cold remedies, contraceptives, dandruff products). *Id.* § 330.5. The FDA also established general safety, effectiveness, and labeling standards to be used by the panels in evaluating all available data. *See id.* § 330.10(a)(4). Interested persons are given an opportunity to submit information and to make oral presentations to the panels. *Id.* § 330.10(a)(2).

As each panel finishes its study, it prepares a formal recommendation for a "monograph" for its drug group (or groups) "establishing conditions under which the drugs involved are generally recognized as safe and effective and not misbranded (Category I.)" 21 C.F.R. § 330.10(a)(5)(i) (1978). In addition to the recommended monograph, the panels must include in their reports to the Commissioner statements of conditions under which drugs in their group would *not* be generally recognized as safe and effective (Category II) and under which the available data are insufficient to classify a drug in Categories I or II (Category III). *Id.* § 330.10(a)(5)(ii)–.10(a)(5)(iii).[17] Because there are hundreds of thousands of

---

**16.** There were 420 OTC drugs reviewed in the DESI review. Implementation of regulations concerning many of them was deferred pending the separate OTC study. *See* 21 C.F.R. § 330.-12 (1978).

**17.** Section 330.10(a)(5) of the regulations provides:

*Advisory review panel report to the Commissioner.* An advisory review panel shall submit to the Commissioner a report containing its conclusions and recommendations with respect to the conditions under which OTC drugs falling within the category covered by the panel are generally recognized as safe and effective and not misbranded. Included within this report shall be:

(i) A recommended monograph or monographs covering the category of OTC drugs and establishing conditions under which the drugs involved are generally recognized as safe and effective and not misbranded (Category I). This monograph may include any conditions relating to active ingredients, labeling indications, warnings and adequate directions for use, prescription or OTC status, and any other conditions necessary and appropriate for the safety and effectiveness of drugs covered by the monograph.

(ii) A statement of all active ingredients, labeling claims or other statements, or other conditions reviewed and excluded from the monograph on the basis of the panel's determination that they would result in the drug's not being generally recognized as safe and effective or would result in misbranding (Category II).

(iii) A statement of all active ingredients, labeling claims or other statements, or other conditions reviewed and excluded from the monograph on the basis of the panel's determination that the available data are insufficient to classify such condition under either paragraph (a)(5)(i) or (ii) of this section and for which further testing is therefore required (Category III). The report may recommend the type of further testing required and the time period within which it might reasonably be concluded.

OTC drugs composed of a relatively small number of active ingredients, the proposed monograph and the statements specify the active ingredients and related therapeutic claims (the "conditions") which would cause OTC drugs in a particular group to be generally recognized as safe and effective, not generally recognized as safe and effective, or not classifiable due to insufficient data. See id. § 330.10(a)(5).

In the second stage of the OTC program, the FDA Commissioner reviews each panel's conclusions and recommendations and issues his own proposal for a monograph and for statements of Category II and III conditions. Id. § 330.10(a)(6). The Category II statement sets out "the conditions excluded from the monograph on the basis of the Commissioner's determination that they would result in the drug's not being generally recognized as safe and effective or would result in misbranding." Id. § 330.-10(a)(9)(ii). The Category III statement lists conditions excluded because "the available data are insufficient to classify such conditions [in Categories I or II]." Id. § 330.10(a)(9)(iii). In addition, the Commissioner's order containing the proposed monograph must "specify a reasonable period of time within which conditions falling within [Category III] may be continued in marketed products while the data necessary to support them are being obtained for evaluation by the Food and Drug Administration." Id. § 330.10(a)(6) (final paragraph).

In the third stage, following a public comment period, the Commissioner publishes a tentative final monograph. Id. § 330.10(a)(7). Finally, after receiving objections in response to that monograph,[18] he publishes a final order and monograph. Id.

§ 330.10(a)(9). In this order the Commissioner also issues the final statements or "determinations" of Category II and III conditions excluded from the monograph. See, e. g., 39 Fed.Reg. 19873, 19873–74 (1974) (antacid product determinations). After the effective date of the final order and monograph, any nonconforming (Category II) drug product "is liable to regulatory action," 21 C.F.R. § 330.10(b) (1978), and may not be marketed.[19]

## C. The Category III Scheme

The regulations governing the OTC drug review project were originally adopted in 1974. 39 Fed.Reg. 11741 & 39556 (1974) (1974 version codified at 21 C.F.R. part 330 (1977)). As originally promulgated, those regulations simply noted that the advisory panels could recommend further testing requirements for Category III drugs and a reasonable time period for such testing, 21 C.F.R. § 330.10(a)(5)(iii) (1978), and required that the Commissioner's orders were to "specify a reasonable period of time" for continued marketing of products with Category III conditions while the FDA obtained additional data, id. § 330.10(a)(6). In the only comprehensive final order to be issued to date, for example—the final determinations and monograph for antacid and antiflatulent products—the Commissioner stated that marketing of products with certain Category III ingredients and labeling claims could continue for two years from date of publication.[20] 39 Fed.Reg. 19862, 19873–74 (1974) (monograph portion codified at 21 C.F.R. parts 331 & 332 (1978)). The original regulations also provided, without much elaboration, that the Com-

---

**18.** He must also hold an oral hearing on the objections "if he finds reasonable grounds in support thereof." 21 C.F.R. § 330.10(a)(8) (1978).

**19.** For example, the Commissioner's final determination regarding the conditions under which OTC antacid products are not generally recognized as safe and effective (Category II) began: "The Commissioner determines that the use of antacids under the following conditions is unsupported by scientific data, and in many instances by sound theoretical reasoning. The

Commissioner concludes that the ingredients, labeling, and combination drugs involved shall not be permitted in interstate commerce effective as of 6 months after publication of the final monograph. . . ." 39 Fed.Reg. 19873 (1974) (emphasis added).

**20.** The Commissioner conditioned this allowance of continued marketing on prompt initiation of testing for effectiveness· by the manufacturers involved. 39 Fed.Reg. 19862, 19873–74 (1974).

missioner could propose amendment or repeal of a monograph and that any interested person could petition for such a proposal. 21 C.F.R. § 330.10(a)(12) (1977) (amended 1977).

In response to "numerous requests for clarification of the conditions under which Category III conditions could continue to be promoted and marketed pending further testing," the Commissioner proposed amendments to the OTC procedural regulations in October 1975. 40 Fed.Reg. 49097 (1975). Eventually, the FDA modified those regulations to provide more detailed procedures for amendment of monographs. This was coupled with a new provision authorizing continued marketing of Category III drugs and specifying the conditions under which such drugs may be marketed pending further testing. 42 Fed.Reg. 12137 (1977) (amending 21 C.F.R. § 330.10(a)).

With regard to continued marketing of Category III products, the OTC regulations now provide:

*Testing of Category III conditions.*

(i) After publication of the final monograph, any product with a condition (e. g., ingredient, labeling claim, combination of ingredients) subject to paragraph (a)(6)(iii) (Category III) of this section may remain on the market, or may be introduced into the market, provided that the Food and Drug Administration receives notification that the number of studies specified in the applicable testing guidelines will be undertaken to obtain the data necessary to resolve the issues that resulted in such classification.

21 C.F.R. § 330.10(a)(13) (1978). In short, in order to take advantage of a Category III classification, and in order to continue marketing the affected product without fear of "regulatory action," a manufacturer must agree to initiate testing under specified guidelines.

The required notifications must be filed within 60 days of publication of a final monograph and must include, inter alia, the name of the study's sponsor, the Category III condition being tested, and the anticipated date of initiation of testing. *Id.* The testing must begin no later than the date on which Category II products, pursuant to the effective date of the final determinations, may no longer be shipped in commerce. *See id.* §§ 330.10(a)(13)(iii) & 330.-10(b). If the required notification statements are not received for any Category III condition, that condition must be placed in Category II. *Id.* § 330.10(a)(13)(v). In addition, the sponsor of a study must file a supplement to its notification within 10 days of the actual initiation of testing. *Id.* § 330.10(a)(13)(vi). Non-receipt of a supplemental notification within the applicable time periods results in immediate placement of the relevant condition in Category II.

The 1977 amendments also added specific Category III provisions to the monograph amendment procedures. Petitions to amend a monograph to include conditions previously placed in Category III must be filed before the expiration date (the end of the testing period) of the condition. *Id.* § 330.10(a)(12)(i). Where testing has been undertaken pursuant to section 330.-10(a)(13), a petition to amend allows marketing of relevant drug products until disapproval of the petition or a decision to reclassify the affected conditions in Category II. *See id.* § 330.10(a)(12)(i). Products placed in Category III may therefore be marketed indefinitely so long as the manufacturer agrees to perform the required testing and then petitions for an amendment of the pertinent monograph.

## II.

Plaintiffs Mimi Cutler, Pamela S. Ellsworth, and Stephen D. Annand are each consumers of various OTC drugs.[21] Plain-

---

**21.** Neither defendant has contested those aspects of plaintiff's affidavits (filed Dec. 19, 1978) which outline their use of OTC drugs. Plaintiff Cutler uses OTC cold and headache drugs and purchases OTC cough medicine for her children. Plaintiff Ellsworth, and her hus-

band, use Contac, Dristan Nasal Spray, Coricidin Cold Tablets and Pepto-Bismol, all of which are purchased without a prescription. In addition, Mrs. Ellsworth has purchased several other OTC products for her infant daughter. Plaintiff Annand states that he purchases and

tiffs claim that the FDA's Category III regulations are unlawful to the extent they authorize the marketing of Category III drugs. According to plaintiffs, if a drug is determined to be in Category III, it necessarily lacks substantial evidence of safety or efficacy, is a new drug, and cannot be marketed without an approved NDA. Plaintiffs claim that the continued marketing of Category III drugs in these circumstances subjects them "to risk to their health and to risk of economic injury." Amended Complaint, para. 20. They also state: "This risk exists presently with respect to Category III drugs being sold to the public, and the risk will probably increase since there is a substantial likelihood that the Commissioner will allow the sale of additional Category III drugs unless this Court declares Category III illegal." *Id.*

Plaintiffs seek a declaration that 21 C.F.R. § 330.10 is unlawful "to the extent it allows the marketing of Category III drugs" and ask the Court to direct revocation of the challenged aspect of the regulations. Also requested is an order directing the Commissioner "to remove from the market all Category III drugs for which there is no approved new drug application." *Id.* at 5.

consumes a "wide variety of over-the-counter drugs including Alka Seltzer, Rolaids, Bayer Aspirin, Bufferin, Tylenol, Contac, Nyquil, Primatene Mist, Robitussin, Neo-Synephrine, Allerest, Allergan Liquifilm and Pepto-Bismol." Affidavit of Stephen D. Annand, at 1. Mr. Annand also explains that he has used other OTC drugs whose names he doesn't recall, and that he reads drug labels to aid in purchasing decisions.

**22.** Plaintiffs claim that the federal defendant's actions permitting Category III drugs to be marketed are arbitrary, capricious, and contrary to law within the meaning of section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1976). Amended Complaint, para. 19. Their cause of action can therefore be said to arise under the judicial review provisions of the APA. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38–39, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). *See generally Public Citizen v. Lockheed Aircraft Corp.*, 184 U.S.App.D.C. 133, 565 F.2d 708, 714–17 (1977); *see also Davis v. Passman*, — U.S. —, — – —, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

## A. Standing

■ As a matter of Article III justiciability, the gist of the question of standing is whether the plaintiff has established an adversarial case or controversy between himself and the defendant. *E. g., Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Most recently, the Supreme Court stated the test for such a case or controversy to be whether the plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Stated another way, there must be both a "distinct and palpable injury to the plaintiff" and a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595, 610 (1978).[22]

■ The focus of this inquiry is on the fact, and not the amount or severity, of the injury. *See United States v. SCRAP*, 412 U.S. 669, 688–89 & n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (identifiable trifle may

The APA grants a right of judicial review to persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Administrative Procedure Act, § 10(a), 5 U.S.C. § 702 (1976). The threshold standing requirement under this section, once thought to have been quite restrictive, is now considered to be essentially the same as the basic Article III inquiry described in the text. *See Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 38–39, 96 S.Ct. 1917; *Public Citizen v. Lockheed Aircraft Corp., supra*, 184 U.S.App.D.C. at 139–142, 565 F.2d at 714–17.

To the extent that there is also a second, nonconstitutional standing requirement, lurking in section 10 of the APA, that the plaintiff's interests be within the "zone of interests to be protected or regulated by the statutory framework within which his claim arises," *Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 39 n. 19, 96 S.Ct. at 1925 n. 19, the Court finds that the instant plaintiffs' interests as drug consumers plainly satisfy it.

be sufficient). In establishing the existence of such injury in fact, plaintiffs are not limited to asserting unique economic or physical injuries, but may also seek judicial relief to redress environmental, esthetic and other sorts of non-economic injuries which are widely shared. *Sierra Club v. Morton*, 405 U.S. 727, 733–34, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).[23]

In order to protect drug consumers from the hazards of unsafe and ineffective drugs, the Federal Food, Drug, and Cosmetic Act requires that every drug, including the OTC drugs used by plaintiffs, be submitted to the FDA for premarketing clearance under specific statutory standards unless the drug is generally recognized by experts as safe and effective for its intended use. Plaintiffs contend that the Commissioner, by sanctioning the marketing of Category III drugs in violation of the Act, has unlawfully *increased the risk* that they will purchase and consume unsafe or ineffective drugs and threatened them with exposure to unlicensed drugs which are not generally recognized by experts as safe and effective.

Plaintiffs' claim of injury must be considered in the context of the comprehensive regulatory scheme created by the Federal Food, Drug, and Cosmetic Act of 1938 and the Drug Amendments of 1962, a scheme whose principal beneficiaries are obviously the nation's drug consumers. Although it is not difficult to appreciate the concrete health injuries which may result form the consumption of unsafe, or even ineffective[24] drugs, plaintiffs' claimed injury, more precisely defined, is different. Their claim is not that they will in fact consume unsafe or ineffective drugs, but that they are being "subjected to *risk* to their health . . . on account of the marketing of Category III drugs which have been found

to lack substantial evidence of safety and effectiveness." Amended Complaint, para. 20 (emphasis added).

As a leading commentator has noted, "[p]roof of the fact of injury becomes particularly elusive with respect to statutes designed to protect against a risk of injury as well as the fact of injury." Wright & Miller, 13 Federal Practice and Procedure § 3531, at 57 (1978 Supp.) In *City of Davis v. Coleman*, for example, plaintiffs claimed that an agency's breach of a statutory duty—failure to prepare an environmental impact statement—created a "risk that serious environmental impacts [would] be overlooked." 521 F.2d 661, 671 (9th Cir. 1975). The plaintiff was located near the site of the challenged project and could be expected to suffer its environmental consequences. There was no need to prove, for standing purposes, that the project would in fact have particular environmental consequences; the creation of an increased risk in contravention of the statute was itself a sufficient "injury in fact." *See id.*

▮ Moreover, Congress may, through the enactment of statutes, create new legal rights or interests, "the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973) (new "legal rights"); *accord, Simon v. Eastern Kentucky Welfare Rights Organization*, *supra* note 22, 426 U.S. at 41 n. 22, 96 S.Ct. 1917 ("new interests"). The Federal Food, Drug, and Cosmetic Act requires that all drugs, except those generally recognized by experts as safe and effective, undergo the rigors of the NDA review process prior to marketing. If, as plaintiffs contend on the merits, the FDA is authorizing drugs to be marketed in violation of the Act, it has

---

**23.** Consumer injuries, by their very nature, tend to be shared in common by many other similarly situated individuals. *See United States v. SCRAP, supra,* 412 U.S. at 687–88, 93 S.Ct. 2405. But that is not a sufficient basis on which to deny standing to persons who are in fact injured. *Compare id. with Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 216–27, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (undif-

ferentiated or generalized interest as citizen insufficient to confer standing).

**24.** *See, e. g.,* Views of Senators Estes Kefauver, John A. Carroll, Thomas J. Dodd, Philip A. Hart, and Edward V. Long, S.Rep.No. 1744, 87th Cong., 2d Sess. 37 (1962) (safe but ineffective drug may be "positively injurious" to health).

increased the risk that plaintiffs will be exposed to unsafe or ineffective drugs by depriving them of regulatory protection which the statute accords all drug consumers. This risk and deprivation itself constitutes a distinct and palpable injury to plaintiffs' statutory interests as drug consumers.

The case or controversy created by this injury is a live one, in the Article III sense, because the regulations challenged by plaintiffs are themselves unquestionably final and because the agency has been actively engaged in their implementation for at least five years.[25] As the Supreme Court has repeatedly noted, the Article III standing [26] question is whether the plaintiff has suffered some "actual *or threatened* injury." *E. g., Gladstone, Realtors v. Village of Bellwood, supra,* 441 U.S. at 99, 99 S.Ct. 1608; *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. 2197. *See also Duke Power Co. v. Carolina Environmental Study Group, supra* (plaintiffs would sustain immediate injury from future operation of atomic power plants then being constructed). The

issue is whether the "injury or threat of injury [is] both 'real and immediate', not 'conjectural' or 'hypothetical'." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).[27]

■ In the instant case, not only is the federal defendant conducting a major program to implement the challenged regulation, but at least one drug product is being currently marketed pending further testing pursuant to an FDA Category III authorization.[28] And although the vast majority of OTC classifications remain in a preliminary stage,[29] numerous conditions affecting a significant number of products have been proposed for final Category III classification.[30] Two tentative final monographs containing such proposals are due to be issued in final form within the next six months. Notice of Filing: Current Status of Antacid Category III Drugs and Progress of Monographs, exhibit B (filed April 12, 1979) (nighttime sleep-aids and stimulants). The nighttime sleep-aid pro-

---

25. By April 1979, the FDA's expert panels had submitted reports covering thirty-seven categories or subcategories of OTC drug products. *See* Notice of Filing: Current Status of Antacid Category III drugs and Progress of Monographs, exhibit B (filed April 12, 1979). Based on these reports, the FDA has issued twenty-one Proposed Monographs, seven tentative final monographs, two final monographs and one final compliance program. *See id.*

 On June 18, 1979, the FDA issued another final order placing all OTC daytime sedatives in Category II. Under its terms, no such product may be introduced into commerce after December 24, 1979. 44 Fed.Reg. 36378 (1979).

26. Questions related to the possible prematurity of an action are generally analyzed as questions of ripeness. Those questions, however, have both Article III and prudential components. *See Duke Power Co. v. Carolina Environmental Study Group, supra,* 438 U.S. at 80, 98 S.Ct. at 2634, 57 L.Ed.2d at 616. For ease of explanation, the Court here considers the Article III aspect of the ripeness doctrine as part of its general standing inquiry. It will examine the prudential ripeness questions—traditionally accorded specialized treatment in the administrative context—separately. See part II–B, *infra.*

27. The Supreme Court recently explained:
 A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a

direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.
*Babbitt v. United Farm Workers National Union,* —— U.S. ——, ——, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (June 5, 1979).

28. The product is Gaviscon, an antacid containing the Category III active ingredient alginic acid. Notice of Filing: Current Status of Antacid Category III drugs and Progress of Monographs (filed April 12, 1979). The final Category III determinations for antacids were issued in June 1974. Pursuant to the FDA's latest action with respect to Gaviscon, that product may be marketed as a Category III product until March 1981, provided that its manufacturer agrees to conduct additional tests. *Id.* at 2.

29. *See* note 25, *supra.*

30. Out of the first 271 significant ingredients studied by the expert panels, 50% were recommended for Category I, 20% for Category II, and 30% for Category III. These preliminary classifications affected an estimated 156,300 marketed products. Affidavit of William E. Gilbertson, Defendant's Cross-Motion for Summary Judgment, exhibit F, at 5 (filed Oct. 27, 1977).

posal, in particular, contains significant Category III classifications. *See* 43 Fed. Reg. 25544 (1978). The Court concludes, therefore, that the threat of injury, as defined above, is both real and immediate.

■ Two other standing issues should be noted. First, both defendants have at various times argued that plaintiffs' injury actually flows entirely from their purported inability to identify Category III drug products. They challenge this allegation as a matter of fact. But even assuming that plaintiffs could, through independent research, monitoring of the Federal Register, or similar means, keep abreast of precisely which of the thousands of OTC products contain conditions (ingredients or labeling claims) classified in Category III, the short answer to defendants' argument is that such a burden is not one which the statute imposes on the consumer. Such efforts could not alleviate the injury to their statutory interests any more than would a decision to forego the use of OTC drugs altogether.[31]

■ Finally, as noted above, the Article III standing inquiry encompasses a second, independent requirement: plaintiffs' claimed injury must have been caused by putatively unlawful actions of the defendant. *E. g., Duke Power Co. v. Carolina Environmental Study Group, supra,* 438 U.S. at 72, 98 S.Ct. at 2630, 57 L.Ed.2d at 610 ("fairly traceable causal connection").

The causation question is generally analyzed by asking whether the requested relief would redress the claimed injury. *Id.* at 612, 438 U.S. at 74, 98 S.Ct. at 2631.[32]

■ Here, it is clear that it is the federal defendant's actions that have occasioned the increased risk of exposure to unsafe or ineffective drugs of which plaintiffs complain. If the Court were to grant the requested relief—ordering the FDA to take steps to remove Category III drugs from the market—the risk would necessarily be eliminated. Moreover, merely by voiding the marketing authorization feature of the challenged regulations, the self-policing scheme of the Act would again be operative and manufacturers of Category III drugs could market these drugs only at their peril.[33] This in itself would vitiate the increased risk to which plaintiffs claim they have been exposed. Defendants argue that plaintiffs' injury, if any, is caused directly by the marketers of OTC drugs and only indirectly by the FDA. But the fact that plaintiffs' injury also depends causally on the actions of third parties is not a bar to standing. *Cf. Warth v. Seldin, supra,* 422 U.S. at 504–05, 95 S.Ct. 2197 (government restriction imposed on one party which in turn causes harm to plaintiff; indirectness of injury does not necessarily bar standing). The Court concludes that plaintiffs have standing to bring this action.[34]

**31.** Category III classifications are made on the basis of particular ingredients, combinations of ingredients, and labeling claims, not drug products. Plaintiffs contend that FDA authorization of continued marketing of these conditions means that they will, for example, have to consume a Category III ingredient in order to get other, unquestionably safe and effective, Category I ingredients. Placement of those ingredients in Category II, however, would mean that the drug product would have to be reformulated or removed from the market, or that a labeling claim would have to be eliminated. Reformulation would allow plaintiffs to utilize the product without the questionable ingredient. Removal from the market would eliminate the risk that plaintiffs would purchase or consume an unsafe or ineffective drug. Elimination of any unproven labeling claim would eliminate the risk of consuming a drug to remedy a condition regarding which the drug was not effective.

**32.** "Our recent cases have required no more than a showing that there is a 'substantial likelihood' that the *relief requested* will redress the injury claimed to satisfy the second prong of the constitutional standing requirement." *Duke Power Co. v. Carolina Environmental Study Group, supra,* 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, 57 L.Ed.2d at 612 n. 20 (emphasis added).

**33.** *See* part I–A, *supra.*

**34.** The Proprietary Association continues to suggest that the three individual plaintiffs are sham plaintiffs who were solicited by the original associational plaintiffs and who have no real interest in the action. The Court stands by its original ruling that, on the undisputed facts of record, this contention is without legal merit. *See HRG v. Kennedy, supra,* at 30–31 n. 14. *But cf. Public Citizen v. Lockheed Aircraft*

*B. Ripeness*

■ The Court has already determined that plaintiffs' action is ripe in the sense of presenting a live Article III case or controversy. *See* notes 25–30, *supra,* and accompanying text. The remaining question is whether the prudential aspect of the ripeness doctrine favors judicial intervention at this time. *See Duke Power Co. v. Carolina Environmental Study Group, supra,* 438 U.S. at 80–82, 98 S.Ct. at 2634–35, 57 L.Ed.2d at 616–17. The purpose of the ripeness doctrine in the administrative context is to "prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The courts are therefore required "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. *See generally Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 18–22, 522 F.2d 107, 124–28 (1974).

As noted previously, it is clear that the challenged regulations are themselves final and represent the agency's final position, following extensive study, on the question of continued marketing of Category III drugs. Moreover, two categories of OTC drugs (antacids and antiflatulents) have already been through the entire regulatory process, and a number of antacid ingredients and labeling claims finally placed in Category III. 39 Fed.Reg. 19862 (1974). When the FDA originally filed its motion for summary judgment in October 1977, it claimed there were 20 nationally marketed antacid products containing Category III ingredients. It is also undisputed that at least one of the individual plaintiffs uses

several antacid products, *see* Affidavit of Stephen Annand, para. 1, and there is at least one Category III antacid product (Gaviscon) being presently marketed with a Category III condition pending further testing under the amended Category III regulations.[35]

Most important, plaintiffs' claim on the merits, like the claim presented in *Abbott Labs,* presents a purely legal question: do the FDA's Category III regulations contravene the statutory scheme pursuant to which they were promulgated? The issues presented are therefore fit for judicial resolution.

With regard to the second factor to be evaluated—the hardship to the parties of withholding judicial consideration—the Court observes that the FDA is now in at least its fifth year of active implementation of the challenged OTC regulations. It is also seventeen years since the 1962 Drug Amendments and the FDA's review of the OTC drug market is nowhere near completion. Moreover, neither defendant has controverted plaintiffs' assertions, supported by detailed affidavits, that the preliminary classification of ingredients and claims into the three categories during the OTC review process has an immediate impact on the marketing decisions of the nation's drug manufacturers. In the sleepaid/sedative category, for example, the total number of marketed brands with ingredients preliminarily classified in Category II decreased from 28 in 1973 to 9 in 1979, while the brands with preliminary Category III ingredients actually increased from 16 to 19. Affidavit of Christopher Coley, table A (filed April 5, 1979).

■ On balance, it seems to the Court that both plaintiffs and the federal defendant would suffer a hardship from further delay in resolving the legal questions raised by plaintiffs, and that the Court will be in no better position to do so later than it is now.

---

*Corp.,* 184 U.S.App.D.C. 133, 135 n. 1, 565 F.2d 708, 710 n. 1 (1977).

**35.** *See* note 28, *supra.* In these circumstances, the fact that none of the plaintiffs is alleged to

be presently using Gaviscon is not a matter of major significance in the Court's prudential ripeness inquiry.

The Court therefore concludes that plaintiffs' claim is ripe under *Abbott Labs* and now turns to the merits of that claim.

## III.

### A. The "General Recognition" Requirement

When Congress enacted the Federal Food, Drug, and Cosmetic Act in 1938, it limited the applicability of its otherwise comprehensive new system for premarketing clearance of the nation's drugs to "new drugs." As explained in part I–A, *supra,* this meant that drugs which were generally recognized by experts as safe and which had been used to a material extent and for a material time were not subject to active regulation under the Act because they were deemed not new.

The 1962 Drug Amendments, although imposing a significant new requirement of effectiveness for both new and old drugs, left undisturbed the basic statutory scheme—strict licensing requirements, but only for new drugs, with manufacturers of drugs in effect making the initial determination whether or not their product was a new drug. The efficacy requirement was grafted onto the Act in two major ways. First, the Act now requires that new drug applications must be supported by substantial evidence of efficacy. Federal Food, Drug, and Cosmetic Act, § 505(d)(5), 21 U.S.C. § 355(d)(5). Second, in order to avoid new drug status, a drug must now be generally recognized by qualified experts as both safe *and* effective for its intended use. *Id.* § 201(p)(1), 21 U.S.C. § 321(p)(1).

Several major interpretive questions prompted by the efficacy amendments were resolved by the Supreme Court in a set of four cases in 1973. *See* note 6, *supra.* Among them was the question, not specifically addressed in the statute, of what constitutes "general recognition among experts."

As part of its DESI (prescription drug) review, the FDA had moved to withdraw the NDA's of many drugs for which there was not substantial evidence of efficacy. *See generally Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). Some manufacturers claimed that even if the efficacy of their products were not supported by such evidence, the products had achieved general recognition of efficacy and were therefore no longer new drugs. The theory was that the statute's strict substantial evidence standard applied only to "proof of the actual effectiveness of drugs that fall within the definition of a new drug and not to the initial determination . . . whether a drug is generally recognized as effective." *Id.* at 629, 93 S.Ct. at 2483. Instead, the industry wanted to establish general recognition through "anecdotal" evidence—testimony of physicians and existing medical literature. *Id.* at 629–31, 93 S.Ct. 2469. By contrast, substantial evidence for new drugs is defined in the Act to include only "adequate and well-controlled investigations, including clinical investigations." 21 U.S.C. § 355(d) (1976).

The Court rejected the industry position in the strongest of terms. General recognition of effectiveness, the Court held, requires "at least" the same substantial evidence of effectiveness which is required for approval of an NDA. *Weinberger v. Hynson, Westcott & Dunning, supra,* 412 U.S. at 629, 93 S.Ct. 2469. Moreover, the Court emphasized, "[t]he legislative history of the Act indicates that the [substantial evidence] test was to be a rigorous one." *Id.* at 630, 93 S.Ct. at 2483. The Court also referred to the general recognition requirement as mandating an "expert consensus" on safety and effectiveness, *see id.* at 632, 93 S.Ct. 2469, a phrase it chose to reiterate in explaining the requirements of general recognition just this term in *United States v. Rutherford,* —— U.S. ——, —— n. 7, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).[36]

---

**36.** The Court's holding in *Hynson* was premised, in part, on its reasoning that the drug industry position was inconsistent with the broader statutory scheme. Before a new drug can be lawfully marketed, it must first be supported by substantial evidence of efficacy in an NDA. In order to be free from the NDA requirement as not new, a drug must, in addition

## B. Category III

Plaintiffs concede that Categories I and II in the FDA's Drug Review Program are consistent with the statutory scheme as interpreted in *Hynson* and its companion cases. Their claim is that Category III—and in particular those portions of the Category III regulations which affirmatively authorize continued marketing of Category III drugs—is unlawful as inconsistent with the statute and in excess of the agency's statutory authority.

Plaintiffs' basic rationale can be quite simply stated. Under the OTC regulations, drugs are not placed in Category III unless there is insufficient evidence to determine that they are generally recognized as safe and effective. Given the *Hynson* case and the strict requirements for "general recognition," they say this means that Category III drugs lack substantial evidence of effectiveness, are necessarily new drugs, and, under the Act, cannot be marketed without an NDA.[37] Since very few OTC drugs are covered by an NDA, plaintiffs argue that the FDA Commissioner has no authority under the Act to authorize the marketing of Category III drugs.

Plaintiffs also apparently contend, although their papers are considerably less clear on this point, that once having concluded, in effect, that Category III drugs are not supported by substantial evidence of safety[38] or efficacy, the Commissioner has a statutory *duty* to take action to remove such drugs from the market. In addi-

tion to asking the Court to void those aspects of the regulations which authorize continued marketing of Category III drugs, therefore, plaintiffs also request an order directing the Commissioner "to take appropriate steps to remove from the market Category III drugs for which there is no approved new drug application." Amended Complaint, at 5.

Defendants' basic position is equally straightforward. Only Category II, not Category III, contains drugs which the agency has finally determined to be not generally recognized as safe and effective. Category III, by comparison, contains conditions regarding which "the available data is insufficient to classify" the condition as either generally recognized or not generally recognized as safe and effective. Therefore, defendants argue, placement of a drug in Category III does not mean that it is a new drug, but only that the agency has decided to reserve a decision on its status until more information is available. The federal defendant also emphasizes that as a matter of practice Category III will only contain conditions regarding which there are questions of efficacy. All potential safety problems which have come to light, even at the panel stage, have been addressed by separate regulatory action outside the rulemaking process.

In addition, the Commissioner argues that the Category III system makes eminently good sense. It allows continued marketing, and encourages continued test-

to general recognition of safety and efficacy, have been used "to a material extent [and] for a material time." Therefore the Court agreed, "the Act is designed so that drugs on the market . . . will have mustered the requisite scientifically reliable evidence of effectiveness long before they are in a position to drop out of active regulation by ceasing to be a 'new drug.'" 412 U.S. at 631, 93 S.Ct. at 2484.

**37.** Plaintiffs concede that this reasoning would not apply to a drug which is exempt from the effectiveness requirement under the grandfather provision of the 1962 amendments. All parties apparently agree, however, that relatively few of the OTC drugs being studied by the FDA would be entitled to such an exemption. The challenged regulations permit continued marketing of Category III products (and

prohibit marketing of Category II products) without reference to whether or not they might be grandfathered.

**38.** The Proprietary Association emphasizes that the substantial evidence test in the Act applies only to the effectiveness requirement. Although this is doubtless technically correct, see 21 U.S.C. § 355(d) (1976), the Act also requires specifically defined investigations and testing to establish the safety of new drugs. *See id.* Not surprisingly, therefore, the Supreme Court has referred to the Act as generally requiring "substantial evidence of the drug's safety and effectiveness" for approval of an NDA. *United States v. Rutherford,* —— U.S. ——, ——, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

854

ing, of safe drugs which are capable of being shown effective, but which do not as yet meet the rigorous testing standards being established by the agency's experts as part of the OTC review process. It is also pointed out that a drug is in Category III even if it is safe and effective for most of its ingredients and recommended uses, but only safe and unclear on effectiveness as to others.

 The question before the Court, however, is not whether the FDA has adopted a wise or reasonable policy, but rather whether that policy, as implemented through the OTC regulations and Drug Review Program, is one which is in harmony with the Federal Food, Drug, and Cosmetic Act. It is of course fundamental that "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977).

In one respect, a great deal of the dispute among the parties could be characterized as semantic. The line between "not generally recognized as safe and effective" and "insufficient data to classify as generally recognized as safe and effective" is not necessarily a bright one. In practical terms, the difference appears to be between the agency being left with a firm conviction that a particular ingredient or labeling claim is ineffective (Category II), on the one hand, and, on the other, a conclusion that existing data suggests that the ingredient or claim might be effective (Category III). *See generally* Final Order for Antacid and Antiflatulent Products, 39 Fed.Reg. 19862 (1974); Affidavit of William E. Gilbertson, Defendant's Cross-Motion for Summary Judgment, exhibit F (filed Oct. 27, 1977); *see also* Advertising of Proprietary Medicines, Hearings Before the Subcomm. on Monopoly and Anticompetitive Activities of the Senate Se-

lect Comm. on Small Business, 95th Cong., 1st sess., pt. 5, at 1771 (1977) (statement of Donald Kennedy, FDA Commissioner).

 Whatever the precise significance of a Category III determination, however, one point is abundantly clear. The Commissioner's OTC regulations formally authorize the continued marketing of Category III drug products in the absence of an administrative determination that those products are, today, generally recognized by experts as safe and effective. This flies in the face of the statutory scheme.

Under the Act, with very limited exceptions not here relevant, drugs can be lawfully marketed in only two ways. They are either new drugs which must be licensed, or they are generally recognized by experts as safe and effective, and are therefore not subject to active regulation. The goal of the Act is to insure that *every* marketed drug is both safe and effective.[39] There are no other possibilities, no interim provisions under which safe, but only potentially effective drugs can be marketed pending testing. Even assuming that defendants are correct that Category III drugs are not *necessarily* unlawful new drugs, there is no question that they are *potentially* unlawful new drugs. To say that the Commissioner has the authority under the Act to affirmatively sanction the marketing of such drugs, effectively exempting them from the enforcement provisions of the Act for periods ranging from two to at least five years, is nothing less than a frontal assault on the premarket licensing scheme of the Food, Drug, and Cosmetic Act.

It is also plainly inconsistent with the rigorous nature of the Act's general recognition requirement. The *Hynson* case establishes that the general recognition exception to the new drug requirements is a narrow one indeed. As the Supreme Court recently observed: "[B]ased on the struc-

**39.** In fact, the legislative history of the 1962 amendments shows that the Senate resisted substantial pressure to pass a version of the amendments bill which would arguably have had the effect of exempting most OTC drugs from the NDA requirement (and hence from a specific requirement of efficacy) so long as they were generally recognized as safe. *See*

note 9, *supra.* Under the rejected version, which was the version originally reported out on the floor, the definition of new drug would have remained unchanged from that in the 1938 Act, meaning that a new drug would have been exempt from active regulation if generally recognized only as safe. *Id.*

ture and purpose of the statutory scheme, this Court in [*Hynson*] interpreted § 201(p)(1) to require an 'expert consensus' on safety and effectiveness founded upon 'substantial evidence' as defined in § 505(d) of the Act, 21 U.S.C. § 355(d)." *United States v. Rutherford, supra,* —— U.S. at —— n. 7, 99 S.Ct. at 2474 n. 7. Indeed, the general design of the Act is that drugs will be supported by substantial evidence of efficacy prior to ever being marketed in the first place. *See Weinberger v. Hynson, Westcott & Dunning, supra* 412 U.S. at 631, 93 S.Ct. 2469.[40] Yet the Commissioner has and will continue to permit OTC drugs to be marketed for potentially indefinite periods merely on a finding, following years of study by expert panels and the agency itself, that the "available data are insufficient to classify" an ingredient or labeling claim as generally recognized or not.

Finally, the challenged regulations, however well intentioned, are fundamentally at odds with Congressional intent as manifested by the specific transitional provisions for the new effectiveness requirements imposed in the 1962 Drug Amendments. *See* part I–A, *supra*. For new drugs covered by an NDA on October 12, 1962, the effect of those provisions was to postpone the new efficacy requirement for a period of two years. After that, such drugs were subject to NDA withdrawal proceedings if they lacked substantial evidence of effectiveness. Drugs which were being marketed as *not* new at the time (generally, the OTC drugs which were then generally recognized as safe), were simply grandfathered. When "intended solely for use under conditions prescribed, recommended, or suggested in their labeling" at the time of enactment of the amendments, such drugs are permanently exempt from the requirement that they be generally recognized as effective. (Neither defendant has contended that a significant number of drugs subject to the Drug Review Program are grandfathered.) All other drugs—primarily drugs which were reformulated,[41] were introduced onto the market after the enactment of the 1962 amendments, or which were then being marketed as generally recognized as safe but whose labeling indications changed— were *immediately* subject to the new requirement of efficacy. In light of these comprehensive and detailed transitional provisions, the Commissioner's decision, over a decade later, to further cushion the impact of the efficacy requirements through a sort of Category III grace period cannot be reconciled with the clear intent of Congress to make those requirements immediately applicable to all but a limited class of OTC drugs.

The Court concludes that the challenged regulations are unlawful to the extent they affirmatively sanction continued marketing of Category III drugs.[42]

### IV.

The question of appropriate relief raises an additional, and difficult, issue. As noted above, part of plaintiffs' requested relief is an order directing the Commissioner "to take all appropriate steps" to remove any Category III drug from the market which is not covered by an NDA. The assumption underlying this request is apparently that the Commissioner, in addition to exceeding his statutory authority by authorizing the marketing of Category III drugs, has violated a statutory duty or abused his discretion by not moving to do just the opposite— removing them from the market.

The Court is sympathetic to plaintiffs' frustrations with the history of enforce-

---

40. *See also* note 36, *supra*. Even if an otherwise new drug could somehow achieve general recognition of safety and efficacy prior to being marketed, it would still be a statutory new drug if it had not been used "to a material extent" and "for a material time." *See* 21 U.S.C. § 321(p) (1976).

41. It is implicit in the grandfather provision that a change in composition of a drug would remove it from that provision's protection. *See USV Pharmaceutical Corp. v. Weinberger,* 412

U.S. 655, 663, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973) (drugs exempted so long as "composition and labeling remained unchanged").

42. Actually, the regulations not only permit drugs with Category III conditions to remain on the market; they also state that such drugs "may be introduced into the market" providing the required testing notifications are received. 21 C.F.R. § 330.10(a)(13)(i) (1978).

ment of the Drug Amendments of 1962. It is now almost seventeen years after the effective date of those amendments and, putting legal niceties of characterization aside, the FDA is nevertheless granting manufacturers of many OTC drugs a lengthy grace period in which to develop the substantial evidence of effectiveness for various claims and ingredients which, under the Act, should have been developed years ago. And this is certainly not the first instance in which serious questions have been raised concerning either the industry's, *see Weinberger v. Hynson, Westcott & Dunning, supra,* 412 U.S. at 626–27, 93 S.Ct. 2469 (industry "tactics of delay and procrastination"), or the agency's, *see American Public Health Ass'n v. Veneman,* 349 F.Supp. 1311 (D.D.C.1972), compliance with their statutory responsibilities.

■■■ On balance, however, even assuming that placement of a drug in Category III, absent grandfather status or coverage by an NDA, is tantamount to a finding of illegality under the Act, the Court cannot agree with plaintiffs that the Commissioner must move to take such drugs off the market.

First, plaintiffs have not attempted to demonstrate that the Commissioner has a duty to seek enforcement action against every unlawfully marketed drug. Certainly, the statutory scheme and traditional notions of prosecutorial discretion[43] would suggest just the opposite.

Only new drugs must be reviewed by the Commissioner prior to marketing. With regard to drugs not subject to active regulation as new drugs, the Act is not self-executing. The agency's ultimate remedy is to request the Justice Department to bring enforcement actions in a federal district court in the name of the United States. *See* 21 U.S.C. § 337 (1976); *Weinberger v. Bentex Pharmaceuticals,* 412 U.S. 645, 650–53, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). Congress did cast certain of the Commissioner's drug review duties in mandatory, non-discretionary terms. *See* 21 U.S.C. § 355 (1976). But with regard to his duty to institute enforcement proceedings, what

little indication there is in the Act is to the contrary. *See* 21 U.S.C. §§ 335–337 (1976). Section 306 of the Act, in fact, states that the Commissioner shall not be required "to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning."

Second, and wholly apart from the question of the agency's discretion, the Court believes that the more extensive relief sought by plaintiffs is unwarranted under traditional principles of equity. The parties have identified only one drug product—Gaviscon—currently being marketed pursuant to a Category III determination. With regard to future Category III orders, the Court's decision to void the marketing authorization feature of the challenged regulations will afford the FDA an opportunity to amend its regulations in any way it sees fit. In these circumstances, it would be unwise and injudicious to require the agency to take steps immediately to remove Category III drugs from the market as they are finally classified. The agency may prefer to revise the system.

It should be emphasized, however, that the FDA may not lawfully maintain Category III in any form in which drugs with Category III conditions (as Category III conditions are presently defined) are exempted from enforcement action. Informally, of course, the FDA will be free to exercise its discretion to seek enforcement actions or not to seek enforcement actions. It may thus be argued that the Court's ruling simply permits the agency to accomplish informally and indirectly what it cannot accomplish in a formal order. But that is the system Congress created. As a general matter, the 1962 amendments exempted many OTC drugs from the effectiveness requirements, but only so long as their composition and labeling did not change. In the years following enactment of the amendments, as OTC drugs were reformulated and relabelled, they immediately became subject to the requirement that they

---

**43.** *See Drake v. Detroit Edison Co.,* 453 F.Supp. 1123, 1131 (W.D.Mich.1978).

be generally recognized as effective, as well as safe. Congress, however, mandated no systematic regulatory review of such drugs, continuing to allow the introducer of the drug to determine, in the first instance, whether the drug had in fact achieved general recognition, among experts, of effectiveness. And it added no new enforcement tools or review mechanisms to insure compliance.[44] As with the original 1938 Act, OTC drugs which did not meet the new effectiveness requirement would be subject to seizure, injunction, and criminal penalties. The Court's decision today requires that this system again be permitted to operate with respect to Category III drugs.

An appropriate Order declaring the regulations unlawful insofar as they authorize the marketing of Category III drugs and enjoining the Commissioner from implementing the offensive aspects of those regulations, accompanies this Opinion.

---

**44.** The FDA's comprehensive review of the OTC market, made feasible by its use of rule-making procedures coupled with administrative determinations of the legal status of drugs, was not mandated by the Act. As a practical matter, it resulted from the FDA's realization that case-by-case review of the OTC market or de novo judicial proceedings were impossible in light of the large number of OTC drugs and the time consuming nature of such procedures. *Weinberger v. Bentex Pharmaceuticals,* 412 U.S. 645, 650–53, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). The Supreme Court found that the FDA's *authority* to proceed as it did was "implicit in the regulatory scheme." *Id.* at 653, 93 S.Ct. 2488.